May it please the Court, Sam Tewksbury for the Plaintiff Appellant, Stacey Fonseca. In the case below, the trial judge dismissed on summary judgment Ms. Fonseca's hospital work environment claim, her retaliation claim, and her wrongful discharge claim, where the facts showed that over the course of her five-month employment, she was repeatedly exposed by her supervisor to pornographic images that he viewed intermittently but repeatedly on his computer screen in his office. The opposing counsel says that she was exposed for a total of approximately one minute to these scenes, which she seemed to be rather anxious to see. Well, if this were a racially hostile work environment case, I would say that if a person were subjected to racial insults over the course of a minute If a person in a racial case came in and found the supervisor looking at material that was racially offensive and he immediately put it away, and a total time in a racial case he saw the supervisor looking at scenes from racial movies in the old days and he turned it off whenever he saw the person, do you think that would be a hostile work environment? Well, yes, I believe so. But if it was a matter of, say, 60 times that this occurred, plus in this instance we have complaint about the exact conduct and a repetition of the conduct, plus we have a failure of human resources to take action. Well, my question was only actually whether the fact is correct that over these many months your client saw for a total time of about a minute. All right. My point is this, Your Honor. Let's turn it around, and it is a racially hostile work environment case. Now, in one minute, over the course of five months, you could hear a racial epithet approximately 60 times, I believe, and that would be a hostile work environment claim. Here, I posit that if she were to have gazed at these images for any great length of time, the employer would be claiming that she welcomed the conduct. Counsel, isn't that one of the problems here? I can see where you get around a lot of the problems on the hostile work environment, but the standard here is whether a reasonable woman would find this to be a hostile work environment. As Judge Reinhart said, at least the record, as far as I know, on challenge is that in the aggregate, she saw this for one minute, but where she did see it more is that she went home, got the website that she went in surreptitiously and found that her boss had been looking at, and looked at it herself on her own computer. She must have – why did she do that? I mean, why would she view it hostilely if she went home and looked at it herself? The reasonable inference to draw from that fact in the record is that once she complained,  but then resumed, and she knew at that point when she glanced and saw something that suggested that Mr. Simmons had resumed his porn viewing in his office, that she probably – I mean, the reasonable inference is she couldn't believe it, and so she went, as did this case out of Massachusetts, to make sure. And I think that Breeden – Did she do that for his welfare, for his soul, or what? Why did she do that? I don't believe any of that's appropriate to the analysis. I believe that she was offended by live-action sex being displayed in her supervisor's office, where her job duties required her multiple times a day to enter the office. The door was open. The record's undisputed. His door was open. His office was set up so that the monitor faced out into the common area, and Ms. Hunter – But he turned it when she came in. Well, I – Isn't that right? That's correct. But the law does not – it's not a requirement that, you know, sexually hostile conduct be directed at. I appreciate that. It doesn't have to be targeted. But back to the reasonable woman standard, that's what your client has to show, is that the reasonable woman would, in that circumstance, find this to be a hostile work environment. Can you cite any case anywhere with comparable facts that finds that? We did cite Cornelio v. City of Berwyn, a Northern District of Illinois case, in support of our position that the – some very similar facts to the fact that – That's important. That's a lot more pornography, a lot more time. There's nothing quite like this, is there? Perhaps not. But I think in – not exactly. Although the Massachusetts case we cited in the reply, the Eldridge case, does have very similar facts. In fact, we have the woman going and searching the website herself to make sure. I think with the – that it's explainable, reasonably explainable, by the lack of response from human resources. I mean, here Ms. Fonseca is reasonably complaining. It's very reasonable to complain. It's inappropriate to display pornography in the workplace in view of others, whether it's meant to be – whether it's – whether you're requiring or requesting people to see it with you, which we often see in cases. But here, whether it's inadvertent or not, the law does not look at the intent of the harasser or the intent behind the conduct. Rather, the Title VII looks at the effect, the deleterious effect. And my brief cite many, many cases in which courts around the country have talked about it, at great lengths, about the deleterious effects of pornography in the workplace. And I accept that, although there are some feminist scholars that would argue the contrary. But the reality is, at least on the hostile work environment claim, I'm having trouble understanding the reasonable woman response. You can get around almost all the rest of them. I can find no case law authority for it. The Supreme Court has been very clear, and indeed has our court, that it is not the purpose of Title VII, and Oregon follows Title VII in its law. It's not the purpose to basically scrub the work environment completely of all innuendos and things like that. There's got to be a quantum of offensive conduct that basically changes the conditions of employment. And I'm asking you to help me here by giving me some case law authority, any kind of authority that would indicate that the law has gotten to the point that if somebody comes into her supervisor's office, he immediately turns the screen. So he doesn't want her to see it, presumably. If he wanted to see it, he would have left it there. He's got a problem, apparently, as far as pornography, and his company dealt with that to some degree. But I don't see where she meets the standard. How does she meet it? She meets it after she complains, and then it resumes. There is evidence in the record that other women in the office refused to open Mr. Simmons' mail. But how did that help? That doesn't deal with her complaint. I think that the Ninth Circuit looks at whether others have found the conduct objective or subjectively offensive, and there's multiple instances where it was. Now, unfortunately, those women were only exposed once or twice. But there's no evidence that their job duties required them to go in and out of the office multiple times. Let's look at it this way. She doesn't know when she's going to be exposed, even at a glance. She doesn't know. It's happening throughout the workday. It's intermittent. She complains. It stops for a while. It starts up again. At that point, I would posit that he is targeting her. For whatever reason, passive aggression, who knows? But I think that here the court erred in not allowing a jury to decide whether this was subjectively offensive to Ms. Poncega, and I think that the record is rife with inference that it is. Your time's up, and you haven't gotten to your other point. Why don't we give you two minutes now, and we'll give you a couple of minutes in rebuttal. Do you want to say anything about either the retaliation or the termination in two minutes? And maybe you ought to concentrate on why she wasn't terminated, because she said she would be unable to work in the company unless she were given a different position which was not available. Well, I think there's a dispute about what was said at the time of the termination, the time she was told to gather her things and go since she didn't want to work there anymore. The law is very clear in the Ninth Circuit that it is not up to the employee to name her remedy. The remedial measures taken previously after her first complaint were clearly inadequate because the conduct resumed, and the case law states that if the conduct resumes, it's as a matter of law an inadequate remedial measure that was taken. And we also have evidence that the investigation took place only after a letter from an attorney threatening legal action or. . . Asking for money for her so she could leave her job and get compensation. There was a complete ignoring of her second complaint, and she continued to be exposed. And it just seems completely unreasonable that the employer would ignore the complaint completely. A reasonable woman. . . Does the record show that she ever knocked on the door before she went into her supervisor's door? The record shows that there was no expectation of anyone knocking on the door. The door was open. But I mean, the reality is that having experienced this a couple of times, isn't it reasonable that she would have knocked on the door so that she would not be exposed? I'm not sure the evidence in the record establishes that she didn't do something proclaiming. I think the jury needs to hear her testimony live, and the jury needs to look at the thumbnail images that were captured off Mr. Seaman's computer after Ms. Fonseca's termination. There's no documentation of Mr. Seaman's ever being disciplined in any real way for . . . although they're claiming after the fact that he didn't receive some kind of incentive pay. So . . . All right. Thank you. We'll give you two minutes for rebuttal. Your Honor, my name is Karen Jones, and I'm here on behalf of the defendant, Kathleen Secor. With regard to the hospital environment . . . Before you get to that, it would be helpful, could you just give us a quick timeline about when the first complaint was, when the second complaint was, when the meeting was with the human resources person? I'll do my best, Your Honor. The first complaint was made to Mr. Reese, and that was in roughly mid-February. Mr. Reese then went and investigated, met with Ms. Secor. I believe it was around the 19th, but roughly that time frame. It may have been a little later in February. In that meeting and discussion, he told her that he did not condone . . . And the company did not condone pornography in the workplace. He had spoken to Mr. Simmons. Mr. Simmons had told him he would not continue the behavior. And then . . . When was the next? The next complaint was, I believe it was in May, when Ms. Fonseca wrote to Marguerite Shuffelman, the vice president of human resources. And then the letter from the attorney was dated May 26th, where the attorney indicated to Ms. Secor. I apologize for not having the dates, Your Honor, but . . . Well, counsel said that after the second complaint, nothing was done. Your Honor, it's correct. Marguerite Shuffleton, there's evidence in the record, had a very serious illness. And so she did not respond to the written complaint from Ms. Fonseca, which, as I think of it, had to be sometime in late April. Now, our view of the law, and I believe it's the correct view, is that in determining whether or not there was a hostile work environment, the employer's response, its investigation, we acknowledge they're factual issues. We believe it was conducted properly. Ms. Fonseca raises issues where she contends it wasn't. But that resolution of that fact issue is immaterial to the determination of whether the conduct was actionable hostile work environment under a hostile work environment theory. The question of whether or not the employer adequately investigated is really only relevant to the issue of liability. If the employer says, all right, well, there was hostile environment, but I'm going to assert a Farragher-Eller defense and say I shouldn't be held liable because we took prompt remedial action or we had good policies in place and you didn't follow those. C-Corp purposes of summary judgment never asserted those defenses, and the only issue before the court on summary judgment and now is whether the conduct itself rises to the level of hostile work environment, actionable sexual harassment. We're not here and shouldn't be here to evaluate the adequacy of the employer's response to that. With regard to the issue of whether or not, and I'll just touch briefly on this, but I did want to address a couple of points that came up with respect to the basic question here of whether or not the court properly ruled that there was no hostile work environment claim here. As Judge Smith has acknowledged, the Supreme Court has set a very high standard that conduct must be extremely serious. And in this case, the court properly looked at the totality of the circumstances and said it was not sufficiently serious to meet that very high threshold. And what makes this case different, and I think it's telling that there is no case counsel can cite because no case exists that even comes close to these facts where the court has found a hostile work environment. This case is different, and it's striking, because of the absence of any of the evidence you find in other cases. No public offensive statements, no physical advances, no conduct directed to the plaintiff. What we have, as you know, is simply the question here of whether someone viewing pornography, and the record does clearly establish, I'm not sure counsel can. Counselor mentioned two district court cases that she said were similar. My recollection was generally cases where there is some pornography like this, but there are, as you say, other circumstances as well. Do you know whether that's true of the two? That's true in those two cases as well, Your Honor. They're not strict solely. There's no case that we could find and no case that counsel has cited where under facts like this, where you have somebody who is in his office viewing pornography, there's an incidental, accidental viewing that clearly was not intended to occur. No case like that where the court has found a hostile work environment. I wonder if I could shift your attention, counsel, to the retaliation aspect of this matter. As you know, under Yartsov, in order to show retaliation in violation of Title VII, the plaintiff has to show a protected activity, an adverse employment action, and a causal link between the protected activity and the adverse employment action. In this particular case, I wonder what your thought is, whether the magistrate judge should have considered Ms. Fonseca's allegation that Mr. Reese threatened discipline as materially adverse because those threats might, and I'm quoting, might well have dissuaded a reasonable worker from complaining about sexual harassment. No, Your Honor. I don't believe that was an error for two reasons. First of all, if you want to look at that alone, you want to say, would that action alone, forget about the discharge decision, constitute an act of retaliation? Or at least raise the material factual issue. Yeah. Raise the material factual issue. I think the answer is no for a couple of reasons. First, when you look at the circumstances of that whole discussion, including Mr. Reese's telling Ms. Fonseca undisputedly that the conduct of Mr. Simmons would stop and that it was contrary to company policy. She admitted in her deposition that he did not say anything to suggest that he was angry or critical of her for coming forward and complaining. And the only statement he made was that he was going to talk to Human Resources about the fact that she had elected to go out in a social setting and talk about Mr. Simmons' behavior to her coworkers. Now, there was no disciplinary action taken. And most importantly, looking at this alone, if the standard is whether that would reasonably deter her from bringing complaints, it didn't. She complained after that. We know it did not deter her. As it relates to the later decision to discharge, if you say, should the court have looked back and said, that's one piece of evidence that goes to the question of whether that later discharge decision, I think the answer there for a different reason is no. And the reason is when you look at that later decision, the question is what was Ms. Shuffleton? She was the decision maker. She's the one who said, I feel like I don't have any choice here, and so you've got to go. It's either you or Reese or Simmons. You've got to go. She actually asked that both Reese and Simmons be fired, right? She did, yes. Or if she could get a different job, which everybody seems to agree was not available. That's right. Now, Ms. Fonseca tried in a declaration to change her deposition testimony on that and suggest that there was a position open, but in her deposition she clearly stated that she was not aware of any position, and Ms. Shuffleton in her declaration indicated there was none. But to complete the point and answer Judge Smith's question with regard to the Reese behavior, Reese said, I'm going to go to human resources. That was Ms. Shuffleton. She didn't discipline Fonseca for that prior action. So there's no way Reese's comment has any bearing or would suggest in any way that Shuffleton's later decision was in any way retaliatory. There's no connection. So there's no link between those, right? There wouldn't be, and I don't see how there could be, whatever Reese did. In this case, we know that Shuffleton didn't act on it in any event. So I think what the retaliation claim comes down to is that the court properly looked at the evidence, and, yes, there are disputes about exactly what was said, but when you look at what is undisputed, we know that there was some questioning of Ms. Fonseca about her willingness to come back to work. We know that she specifically said it would be difficult for her to work with Mr. Reese and with Mr. Simmons. We know that her attorney had sent a letter prior to that saying she doesn't want to come back to work and would be willing to talk about a severance arrangement. And we know that there was no alternative position available, so that the court properly concluded that faced with this choice of do I fire two people who I don't believe deserve to be fired or let Ms. Fonseca go, there really wasn't any alternative, and there's nothing retaliatory about that decision. Do you think that the magistrate judge properly handled the burden shifting required under an article, I mean a Title VII claim of this nature? Well, I think the court came to the right conclusion, and as you know, in a retaliation case, the McDonnell-Douglas burden shifting does apply. And while the court didn't specifically allude to that, I think that's, in effect, what she was doing. When Secor came forward, when she talks about the intervening act, Secor's explanation provides a reasonable explanation for its decision to discharge, and there really wasn't sufficient evidence presented, any evidence presented. So you're suggesting that they didn't handle any pretextual aspect of this, they just didn't meet their burden? That's correct, Your Honor. Unless the court has other questions, that's all I have. Thank you. A couple of things. The Reese's threatened discipline of Ms. Fonseca after her first complaint, regardless of why he claims that he was going to contact HR, does bear on the later dispute. What did he say? I thought he told her that she shouldn't discuss this in social settings, and that he was going to report that to human resources. There was no evidence that there was any forewarning about that. Furthermore, it's very . . . Did he say, I'm going to fire you, I'm going to discipline you? Well, the record indicates that, and he doesn't deny, that he told her he was thinking about contacting human resources for her discussion with her coworkers about Mr. Simmons' pornography viewing habits. Now, the record also indicates that others in the office first told Ms. Fonseca about Mr. Simmons' pornography viewing habits, and there is no evidence that, and there is evidence Mr. Reese spoke with those women, and no evidence that any of them were threatened with an HR contact or threatened with discipline, potentially for discussing that with Ms. Fonseca. Ms. Fonseca is the only person who was targeted with this threatened discipline, and threatened discipline is, even still under the white cases out of the Supreme Court, would be viewed as an adverse action for retaliation purposes under Title VII. And so, the other reasonable inference is that we know from the record that Mr. Reese had contacted Ms. Shuffleton, the HR person, about Ms. Fonseca previously complaining. And so, it's reasonable to infer that the whole investigation that finally took place in the 11th hour was tainted. There's very strong evidence that Ms. Fonseca's character was the focus and target of the investigation, not Mr. Simmons' corroborated and admitted pornography viewing, which resumed after he had been admonished. It seems fairly clear. They got a letter from a lawyer who said that she doesn't really want to work there. She wants compensation, and they had a meeting to discuss what she wanted, and they said, do you want to discuss what you want without your lawyer? And she said, no, I want the lawyer, and then she discussed a lot of it anyway, and she made it clear to them that she wouldn't work there with either Reese or Simmons. And I think that without her full testimony at trial, it is not clear from the record that, and we absolutely dispute that she required or requested that Simmons and Reese be fired. That was a response from a carefully crafted defense question at deposition. It was not Ms. Fonseca's statement, and both the district court and C-Corps have misrepresented the record in stating that there was some kind of ultimatum. Well, it's also, it's not only there. It's in the affidavit of Ms. Shuffleton when she described the meeting and in her notes. Ms. Fonseca disputes that she ever leveled an ultimatum that Reese and Simmons be fired. Right. Ms. Fonseca's affidavit does say that had there been some assurances that this would stop for real, finally, she would have been okay with staying there. Well, that's certainly contrary to a deposition testimony. But there was no assurance. That was minus any assurance, minus any assurance. Now, they asked the civil defense whether there was anything that they could do to make it possible to work with them again. I think we have a dispute as to what was said. Well, there's no dispute about what was said. It's a transcript of what was said at the deposition. I don't believe Ms. Fonseca agrees that there was any assurance that there would be remedial action. No, no, there wasn't any assurance. But she was asked whether there was anything about, that could be done about either of them, that would make it possible for her to work with them. And Ms. Fonseca said, that's not my job. I just want, it was very clear that through three complaints, well, two complaints initially on her own, and one through an attorney, that it was clear to her at the end that nothing was going to be done. And she also had the, I mean, let's look at it this way. If everybody is saying that there has to be pornography plus something else, in this particular case, the plus comes in at the point where she complains. There's an admonishment. The conduct recurs. She complains again. Ignore the complaint. She goes to an attorney. The attorney sends a complaint and essentially a demand letter. And then there's an investigation. And then, rather than take reasonable steps, all sorts of reasonable steps one could imagine could have been taken here, rearranging his desk, reassignment of him to another admin. I mean, it's, this is a big office, a professional setting, and in this day and age, it is not, it should not, I think that an affirmance of the district court's dismissal of this case would send a very dangerous message to employers and would subject women in the workplace to all sorts of harassment, saying, you can complain and we will do nothing, and you can be terminated after you complain, and it's okay for your supervisor to continue offensive conduct. I think it's just very dangerous. And if there is no case that directly addresses the issue, it's time for this court, because it's clear that there's been an expansion recently of what constitutes a hospital work environment. From the Dominguez-Curry case, from the NEA case, it's been expanding, and I think that it's time for us to say a complaint and then resumption is, it's hostile. Well, you're certainly correct that it doesn't have to be a case that goes as far as you might like us to go. One of the options is to broaden the law and extend it and establish rules. So the fact that there isn't a case doesn't mean that we couldn't do that. Whether it's wise to do it or whether the law permits us to do it is a different question, but the fact that we question you and you say there's no case that deals with this precise circumstance doesn't mean that there couldn't be. That's our position. Thank you. Thank you. Thank you both very much. The case just argued will be submitted. Next case on the calendar is Davis v. Team Electric.
judges: Goodwin, Reinhardt, M. Smith